**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION**

**GARY SCOTT STROUD,**
**D.O.C. # K81945,**

**Plaintiff,**

**vs.** **Case No. 4:23-cv-235-RH-MAF**

**COLONEL JACOBS,**
**BARFIELD, and**
**K. STANFORD,**

**Defendants.**
**_____________________________/**

# REPORT AND RECOMMENDATION

Plaintiff is a state prisoner proceeding *pro se* and *in forma pauperis* on his fifth amended civil rights complaint pursuant to 42 U.S.C § 1983, ECF No. 68, alleging Defendants failed to protect him from an attack by other prisoners in violation of the Eighth Amendment. Before the Court is Defendants' Motion for Summary Judgment, which has been fully briefed. *Defendants' Motion*, ECF No. 136; 136-1 through 136-21; *Plaintiff's Response in Opposition,* ECF No. 138; 138-1 through 138-13.[1] The parties

[1] Many of the exhibits are duplicative. For example, everyone includes the protective management reports. E.g., ECF Nos. 136-10 at 11 & 13, 138-12. Defendants include several exhibits multiple times, i.e. the incident reports, protective management reports, housing detail record, and medical evaluations for each incident as separate exhibits and combined as attachments to four declarations. E.g., ECF Nos. 136-4, 136-6, 136-7; compare with ECF Nos. 136-10 at 7-18, 136-11 at 7-18, 136-12 at 6-17, 136-13 at 6-17. For ease of reference, the Court will cite to the duplicative exhibits from a single source,

were given sufficient time to conduct discovery prior to the summary judgment deadline. The motion is ripe for review.

## I. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004). This showing must be based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed. R. Civ. P. 56(c).

Summary judgment should only be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 323. The non-moving party "must do more than simply show that there is some

ECF No. 136-10, with the relevant page number. Also note that Plaintiff's "Exhibit S," ECF No. 138-13, is only the first two pages. The remaining six pages were addressed by the Court as Plaintiff's motion to reopen discovery, which he included with his response in opposition. See *Order*, ECF No. 140 (denying additional discovery).

metaphysical doubt as to the material facts." Matasushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal marks omitted).

While the Court does not engage in fact-finding at the summary judgment stage, it must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party. Sconiers v. Lockhart, 946 F.3d 1256, 1262-63 (11th Cir. 2020). But "[c]onclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial to defeat a well-supported summary judgment motion." Solliday v. Fed. Officers, 413 F. Appx. 206, 207 (11th Cir. 2011). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment should be granted. Matasushita, 475 U.S. at 586.

## II. Overview of Rule 56 Evidence

Unless otherwise noted, the following facts are undisputed. Plaintiff was a prisoner at Liberty Correctional Institution. ECF No. 68 at 5-6.[2]

[2] Plaintiff's complaint, ECF No. 68, was signed under penalty of perjury. The non-conclusory facts alleged within it constitute evidence which may be considered in ruling on the summary judgment motion. Sears v. Roberts, 922 F.3d 1199, 1206 (11th Cir. 2019).

Defendants Jacobs (Security Chief), Barfield (Head of Classification), and Stanford (Assistant Warden) were correctional officials on the Institutional Classification Team (ICT) at Liberty CI responsible for protective management recommendations. Id. at 2-3; See Fla. Admin. Code R. 33-602.221(1)(g).

Plaintiff alleges Defendants failed to protect him from harm because Defendants, as the ICT, recommended against a transfer after Plaintiff's life was threatened by a gang member in his dorm. E.g., ECF No. 136-10 at 10; ECF No. 68 at 7. Below is a timeline of events during the relevant period of March 2023 through May 2023:

- March 27th around 2:30 AM: Plaintiff goes to the bathroom, where he claims he is threatened by a member of the Latin Kings gang (later identified as Inmate Norona). ECF No. 136-10 at 7, 10.

- March 27th around 2:00 PM: Plaintiff reports the incident to the officer-in-charge, Captain Larry Graham. ECF No. 136-10 at 6. Graham interviews Plaintiff. Id. Plaintiff tells Graham he "was approached by gang members in the dorm…and was told to pay up or he was going to get hurt. He stated he was in a bad situation and needed help." Id. Plaintiff's mother called and told Graham she "was concerned for [Plaintiff's] safety." Id. In a written statement, Plaintiff says that "a Latin King" threatened to "stab" him "in the face" if he 'doesn't get right.' ECF No. 136-10 at 9. Plaintiff says he owes $350.00 to around ten inmates but cannot pay. Id. Plaintiff only identifies one of the inmates he owes money to, an orderly that he calls "Big Frankie." Id. Plaintiff does not name the Latin King. Id. Plaintiff is moved to administrative confinement pending further review. Id. at 6.

- March 27th around 3:54 PM: Plaintiff is assessed by medical. He has

no medical complaints or injuries.[3] ECF No. 136-10 at 17.

- March 28th: Defendant Jacobs confirms Plaintiff is to "remain in [administrative confinement] pending review of possible protection needs." ECF No. 136-10 at 6, 11.

- March 30th: the Warden assigns a Security Threat Group (STG) Investigator, Sgt. McMillian, to do follow-up. ECF No. 136-10 at 6.

- April 6th: Sgt. McMillian interviews Plaintiff about the allegations. Plaintiff tells him he owed between eight and ten inmates money for drugs. ECF No. 136-10 at 11. Plaintiff identified Inmate Norona as the Latin King who threatened him in the bathroom on March 27th; Plaintiff alleged Norona held a knife to his throat and if Plaintiff didn't pay up, Norona "would only have to make one call." Id. Plaintiff told McMillian that Norona put a "hit" out on Plaintiff because Plaintiff cannot pay him.[4] Id. McMillian interviewed Norona. Id. Norona said he did not have any issues with any inmates and declined to write a written statement Id. McMillian notes that no camera footage captured the threat; no injuries were reported or observed; and after reviewing JPay (inmate banking transactions) and Securus (inmate phone calls), "no sustainable evidence could be identified in this investigation." Id.

- Sometime between April 6th and April 13th: Defendants "conducted an inmate search and were unable to identify and confirm the inmate with the alias 'Frankie' or 'Big Frankie' based off the information that [Plaintiff] provided." ECF No. 136-10 at 4 ¶ 11. Defendants "had no knowledge of an inmate" at Liberty CI with such an alias. Id. Aside from Norona and 'Big Frankie,' Plaintiff did not provide any other names of inmates who he owed money. ECF No. 136-3 at 21. Plaintiff explained during his deposition that this was because the other "inmates were not a life threat" to Plaintiff. Id. at 21:14. The "only one that acted like a

[3] During his deposition, Plaintiff admitted that he was not injured during the March incident and Inmate Norona "did not touch" him. ECF No. 136-3 at 13.

[4] Plaintiff's response alleges that the "hit" was captured on "audio surveillance" on March 28, 2023. ECF No. 138 at 5. Plaintiff attaches no such evidence as an exhibit. None of the ICT or investigatory reports note the existence of such evidence. Plaintiff's belief or argument that there is audio evidence does not make it so.

threat was…Norona, the only one.” Id. at 21:22-23.

- April 13th: Plaintiff meets with Defendants for his ICT protective management hearing.[5] ECF No. 136-10 at 11. Defendants recommend Plaintiff’s protective management request be denied as “no confirmed risk” because Plaintiff “provided no evidence to support his allegations and has no injuries.” Id. Sometime after the hearing, Defendants’ recommendation is sent to the State Classification Office (SCO) for final determination.

- April 17th: The SCO “disapproved [Plaintiff] for protective management.” ECF No. 136-13 at 3 ¶ 8. The disapproval is noted by DOC Correctional Services Consultant Robert Gould, who works within the SCO. ECF No. 136-10 at 11.

- April 18th: Plaintiff was notified of the SCO decision and elected to appeal. ECF No. 136-14 at 2. During the appeal, Plaintiff remained in administrative confinement. Id.; ECF No. 136-10 at 12; ECF No. 136-13 at 3 ¶ 9-10.

- April 18th-20th: Plaintiff filed an informal grievance to the Assistant Warden on April 18th, stating “the ICT board did not allow me a chance to explain the life threatening situation I am in, that has no resolution.”

---

[5] The parties dispute what occurred at this hearing. Defendants “do not recall the ICT interview with [Plaintiff].” ECF Nos. 136-10, 136-11, and 136-12, all at 2 ¶ 5. The ICT report details that at the hearing, Plaintiff “stated he was in fear for his life due [to] owing $350 to several different inmate[s] for drugs and cannot pay his debt.” ECF No. 136-10 at 11. Plaintiff denies that he told Defendants “anything.” ECF No. 134-3 at 25:8. Instead, Plaintiff claims Defendant Jacobs said, “it says here you owe some people money.” Id. at 25:15. Plaintiff responded with “yes, sir.” Id. at 25:16. Defendant Jacobs then “shut down” the interview. Id. at 25:16, 24-25. Plaintiff “was not allowed to explain anything.” Id. at 25:25-26:1; ECF No. 68 at 6. Defendants contend that all inmates “are asked by the ICT if there is any additional information that they need to provide ICT based on the investigation…and their witness statement. The only time an interview is shut down is when the interviewee is disorderly.” ECF Nos. 136-11, 136-12, both at 2-3 ¶ 6; ECF No. 136-10 at 2-3 ¶ 6-7. Defendant Jacobs denies shutting down the interview and also adds several things he “would have…asked [Plaintiff] if [Plaintiff] owed inmates money.” ECF No. 136-10 at 2-3 ¶ 6-7. Defendants’ generalizations are mostly speculative since they do not remember the interview. But as discussed later, the above disputes are not material.

ECF No. 136-15 at 2. On April 20th, Defendant Barfield denied the grievance, stating Plaintiff was given the chance to explain at the ICT hearing on April 13th. Id. Barfield wrote that Plaintiff "told [Defendants] that you owed money for drugs you knew you couldn't pay for and you hadn't been assaulted by anyone at Liberty CI. You've still provided no information to warrant placement in a Protection Management Unit or anything to overturn the [Defendants'] recommendation." Id.

- April 18th-April 27th: Also on April 18th, Plaintiff appealed the ICT recommendation and SCO decision to the DOC Secretary's Office. ECF No. 136-16 at 3. Plaintiff believes he "outlined…[e]very detail" in the appeal and the Secretary's Office "had full knowledge about what" occurred" based on what he wrote in the appeal. ECF No. 136-3 at 34:6-15. Plaintiff's appeal "griev[ed] the fact that" Defendants "did not allow me to explain my need for a transfer." ECF No. 136-15 at 3. He then wrote a detailed account of the events that made him fear for his life and why he sought a transfer. Id. On April 27th, the Secretary's Office denied Plaintiff's appeal. Id. at 2. After review of Plaintiff's appeal, Plaintiff's "request for protection," and the investigation, the Secretary's Office [via representative Z. Culpepper] upheld the ICT and SCO "decision to deny [Plaintiff] protective custody at this time" because Plaintiff "provided no substantial evidence to show a need for special protective measures above and beyond [DOC's] normal security operations." Id.

- May 1st around 2:00 PM: Plaintiff was released from administrative confinement and placed back in general population housing. ECF No. 136-10 at 12.

- May 1st around 3:30 PM: Plaintiff "was attacked by multiple inmates" in the general population housing area. ECF No. 136-10 at 16. He was taken to medical around 4:00 PM, where his injuries of a hematoma to the right side of his forehead and a small "reddish area" on his neck were documented. Id. at 17. No bleeding was reported. Id. Plaintiff believes he sustained a concussion and later experienced dizziness. ECF No. 68 at 6; ECF No. 138-13 at 2. He was again placed in administrative confinement pending the outcome of the investigation. ECF No. 136-10 at 13-14.

Plaintiff did not see who attacked him on May 1st and did not know if it was because of Inmate Norona's 'hit', the money he owed other inmates, or a potential third reason: Plaintiff was later told by an inmate that he had been labeled a "snitch" in April 2023 because Plaintiff spoke with Sgt. McMillian while he was in administrative confinement. ECF No. 136-10 at 13, 16; ECF No. 136-3 at 41, 45-46. There was a rumor that Plaintiff had told Sgt. McMillian about a hiding place where another inmate had undisclosed items, presumably contraband, and the inmates blamed a dorm search on him. ECF No. 136-3 at 46. Plaintiff was not labeled as a snitch until sometime in April and did not learn of the label until after the May 1st attack. Id. He first informed corrections staff about it in his May 18th written statement. Id. at 47; ECF No. 136-10 at 16.

Sgt. McMillian investigated Plaintiff's need for protection based on the May 1st incident. ECF No. 136-10 at 13. He interviewed Plaintiff on June 3, 2023. Id. Plaintiff's ICT hearing with Defendants for the May 1st incident was on June 8, 2023. Id. Plaintiff told McMillian and Defendants (at the ICT hearing) about being "jumped" and called a snitch. Id. Defendants recommended a "protection transfer due to injuries received" and "to avoid future incidents and possible retaliatory acts" but did not recommend "placement in [protective management]." Id. On June 12, 2023, the SCO,

again via Robert Gould, approved Plaintiff's transfer "based upon security investigation and ICT recommendation." Id. While the May 1st incident is relevant for context, the issues in this case concern the March 27th incident, investigation, and ultimate denial of transfer recommendation, which all occurred prior to May 1st.

**III. Eighth Amendment – Failure to Protect**

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994). This includes a duty "to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833 (quoted in Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616-17 (11th Cir. 2007)). However, not "every injury suffered by one prisoner at the hands of another…translates into constitutional liability for prison officials." Id. at 834; See also Purcell v. Toombs Cty., 400 F.3d 1313, 1321 (11th Cir. 2005) ("[A] prison custodian is not the guarantor of a prisoner's safety.")

"A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer, 511 U.S. at 828. In the context of inmate safety, deliberate indifference occurs when a prison official "actually…knows that an inmate is facing a substantial risk of serious

harm, yet disregards that known risk by failing to respond…in an objectively reasonable manner." Rodriguez, 508 F.3d at 617. Actual knowledge of the risk can be based on direct or circumstantial evidence and includes situations "that suggest the defendant-official…had been exposed to information concerning the risk and 'must have known' about it." Farmer, 511 U.S. at 842. But if a prison official who knows of such a risk responds reasonably, "even if the harm…was not averted," there is not an Eighth Amendment violation. Id. at 844.

Accordingly, Plaintiff must demonstrate the following: (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) a causal connection between the defendant's conduct and the Eighth Amendment violation. See Brooks v. Warden, 800 F.3d 1295, 1301 (11th Cir. 2015). In the instant case, Plaintiff's claim revolves around a threat made to his life. Prison officials must possess enough details about a threat to enable them to conclude that the threat presents a "strong likelihood" of injury, not a "mere possibility." See Id. at 1295; Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990). This is because "[t]he unfortunate reality is that threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." Marbury v. Warden, 936 F.3d 1227, 1236 (11th Cir. 2019) (internal quotations omitted).

The second prong is a showing of deliberate indifference. A plaintiff must show the prison official (1) knew of the substantial risk to the plaintiff's health and (2) disregarded that risk by conduct that was subjectively reckless. See Wade v. McDade, 106 F.4th 1251, 1262 (11th Cir. 2024). "Subjective recklessness" requires a showing that the "defendant was actually…aware that his [or her] own conduct caused a substantial risk of serious harm to the plaintiff." Id. Finally, "even if the defendant actually knew of a substantial risk to inmate health or safety, he [or she] cannot be found liable under the [Eighth Amendment] if he [or she] responded reasonably to the risk." Id. (citing Farmer, 511 U.S. at 844-855). "Merely negligent failure to protect an inmate from attack does not justify [§ 1983] liability." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990).

## IV. Discussion

Defendants concede that, under the law, Plaintiff has made a sufficient showing of the first element, a substantial risk of serious harm. ECF No. 136 at 15 n.13. They focus their arguments on deliberate indifference and the reasonableness of Defendants' response. Id. at 15, 18-22. Plaintiff argues that Defendants were deliberately indifferent to the threat against him because they had "all the information needed to conduct a thorough investigation into" the threat "so as to warrant a transfer," but did not "verify"

the information Plaintiff gave them and declined to recommend a transfer. ECF No. 138 at 5-6. Plaintiff also argues that Defendants “did not allow” Plaintiff “to explain any details in reference to the life threat facing” Plaintiff during the ICT hearing, which left the SCO and Secretary’s Office with “nothing to warrant” overturning Defendants’ recommendation. Id. at 5.

As discussed below, this is not a situation where Defendants “pull[ed] the wool over [their] eyes to escape liability by refus[ing] to verify underlying facts that [they] strongly suspected to be true, or declin[ing] to confirm inferences of risk that [they] strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating [a planned attack] but resists opportunities to obtain final confirmation).” Farmer, 511 U.S. at n.8. Defendants did not resist or shirk their obligation to investigate the threat Plaintiff brought to them.

The undisputed record evidence shows that Defendants (in concert with other DOC staff via the protective management investigation process) took the following actions after Plaintiff reported the March 27, 2023 threat on his life: immediately separated Plaintiff from the potential threat by placing Plaintiff in administrative confinement pending the final protective management decision; sent Plaintiff for a medical evaluation to check for injuries; obtained a written statement from Plaintiff; determined no cameras

captured the incident because it occurred in a bathroom; interviewed Plaintiff for additional details; separately interviewed the inmate Plaintiff claimed was threatening him; tried to identify the other inmate Plaintiff named by nickname; reviewed banking and phone records for corroborative evidence; held an ICT hearing; and reviewed all investigative materials. E.g., ECF No. 136-10 at 3, 4, 6, 9, 10.

Plaintiff admits no one witnessed the March 27th bathroom threat and he had no physical injuries. ECF No. 136-3 at 13, 23-24. As mentioned, there was no video of the incident. Plaintiff claimed he owed between eight and ten inmates money for drugs, but he only provided the name of the one that threatened him (Norona) and the nickname of one other ("Big Frankie"). E.g., ECF No. 136-10 at 11, 3-4 ¶ 10. Norona denied that he had a problem with any inmate. ECF No. 136-10 at 11. Defendants did not know of an inmate at Liberty that went by "Big Frankie" and could not identify one via an inmate search. Id. at 4 ¶ 11. Plaintiff could have disclosed the names of the other six to eight inmates he owed money. This information could have served as corroboration of Plaintiff's allegations or a further investigative step. But Plaintiff chose not to provide the information because he did not think the others "were…a life threat" to him, "only…Norona." ECF No. 136-3 at 21:14, 21:22-23. Defendants cannot draw an inference of a risk of harm where

Plaintiff fails to provide the necessary information. Further, no banking records or phone calls were identified that could corroborate Plaintiff's claims. Plaintiff provided no additional evidence.

Plaintiff must show evidence that Defendants "knew" their recommendation to deny Plaintiff placement in protective management "would endanger" him. See McClinton v. Warden, Baldwin State Prison, 172 F.4th 1276, 1284 (11th Cir. 2026) (affirming grant of qualified immunity where the plaintiff failed to establish deliberate indifference). Defendants must have been "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." Farmer, 511 U.S. at 837.

Here, the evidence is clear that at the conclusion of the investigation, Defendants did not draw that inference because they "did not subjectively believe that [Plaintiff] was in serious danger, and thus [their] mental state did not constitute deliberate indifference." McClinton, 172 F.4th at 1286. Plaintiff did not provide any details that Defendants could corroborate, and without any injuries to Plaintiff, or any other verifiable information, Defendants were left with a single prisoner's word that he owed a lot of inmates money and one threatened to harm him (which that inmate denied). It was reasonable for Defendants to recommend a denial with such little evidence to go on.

Page 15 of 19

"[A]wareness of 'risk in the abstract' to [Plaintiff] based solely on his vague request for protective custody is insufficient for Eighth Amendment liability." Id., *quoting* Wade, 106 F.4th at 1259. "[W]ithout evidence that [Defendants] actually knew that sending [Plaintiff] back into general population endangered him," there cannot be a finding of deliberate indifference. Id.

Plaintiff argues that Defendants were deliberately indifferent when they "shut [the ICT hearing] down after" Defendant Jacobs asked Plaintiff "one question which only referenced owing money." ECF No. 138 at 6. Plaintiff argues that because he was not "allowed to say anything else," the SCO and the Secretary's Office had no basis to reverse Defendants' recommendation. Id. at 5. Plaintiff thinks he should have been able to "fully explain what was going on." ECF No. 136-3 at 52:21. Even assuming Plaintiff is correct and Defendants shut down the interview, there is still not a showing of deliberate indifference. Plaintiff admits he provided Sgt. McMillian "a full outline…of everything that was going on" and the information is "fully in his report." ECF No. 136-3 at 27:20-21. Defendants reviewed McMillian's report, as well as the incident report and Plaintiff's written statement, before making their recommendation. E.g., ECF No. 136-10 at 3-4 ¶ 9-10. Defendants were aware of the information Plaintiff claims he was not permitted to tell them at the ICT hearing. The information could not be corroborated, despite a

reasonable investigation.

After reviewing all of the investigative materials, Defendants recommended that Plaintiff's request for a protective management transfer be denied. ECF No. 136-10 at 11, 4 ¶ 12. Everything was sent to the SCO for review and final decision. Id. at 4 ¶ 13. The review was assigned to CSC Gould, who agreed with Defendants and disapproved the transfer. ECF No. 136-10 at 11, 136-13 at 3 ¶ 8. Plaintiff was allowed to appeal the decision to the DOC Secretary's Office. He did just that. ECF No. 136-16 at 3. He was permitted to remain in confinement pending the outcome of the appeal. Plaintiff claims his appeal documented "every detail." ECF No. 136-3 at 34:7. The Secretary's Office then reviewed Plaintiff's appeal, Plaintiff's "request for protection," and the "subsequent investigation." ECF No. 136-16 at 2. Defendants' recommendation and the SCO denial were upheld because Plaintiff "provided no substantial evidence to show a need for special protective measures above and beyond our normal security operations." Id.

Plaintiff's other argument, that he "gave all the information needed to conduct a thorough investigation into [the] life threat so as to warrant a transfer," is not well taken. See ECF No. 138 at 6. Plaintiff's position would mean that any time a prisoner tells the ICT (or other relevant prison employee) about a substantial threat of serious harm, the prison *must*

transfer him—even if the investigation does not uncover evidence of the threat of harm outside of the prisoner's own self-serving statements, even if a prisoner's statements are not found credible, or even if the prisoner may have ulterior motives for seeking a transfer (including, perhaps, avoiding the repayment of money to inmates by starting over at a new prison[6]). That is not what the Eighth Amendment requires, for obvious reasons.

"A prisoner does not have a basis for a civil rights claim for failure to protect simply because he disagrees with the classification decision made by classification officials." Muhammad v. Sloan, 2010 WL 99349, at *2 (N.D. Tex. Jan. 8, 2010), *quoted with approval in* Manzo v. C. Courtney, No. 3:19-cv-3357-LC-HTC, 2021 WL 2322641, at *6 (N.D. Fla. May 6, 2021), report and recommendation adopted sub nom. Manzo v. Courtney, 2021 WL 2313446 (N.D. Fla. June 7, 2021). These are the very types of decisions which require affording to prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979). Prison officials know far

---

[6] Plaintiff admitted that he "didn't ask for a [protective management] transfer," because he "just wanted to get away from that camp...[he] didn't want to go to a [protective management] camp…[he] just needed, for safety reasons…[to] go to a different place." ECF No. 136-3 at 27:9-13. He "didn't want a [protective management] transfer." Id.

better how to protect the safety of inmates behind prison walls than the courts.

The fact that Plaintiff was ultimately attacked after being released into general population on May 1st does not change the outcome.[7] The reasonableness of Defendants' response is determined by what they knew—objectively and subjectively—*before* the May attack. Courts cannot use hindsight to determine whether there was a violation of the Eighth Amendment. Brooks, 800 F.3d at 1302. In this case, there is no evidence that Defendants did not respond reasonably to Plaintiff's request for protection, let alone evidence that their conduct was subjectively reckless. The undisputed material facts show that Defendants were not deliberately indifferent and that they responded reasonably to Plaintiff's substantial risk of serious harm. Defendants' motion for summary judgment should be granted.[8]

---

[7] This is especially true because there was an intervening potential cause for the May attack that had nothing to do with Norona or owed money. Plaintiff himself was unaware of the possible cause until weeks later, when he learned that he was labeled a snitch after some inmates thought he ratted out a hiding place to Sgt. McMillian. The first time he told prison officials was around May 18th—Defendants could not have known about it during the earlier March and April period. Plaintiff's injuries, coupled with the snitch label, was sufficient for Defendants to recommend a transfer to "avoid potential incidents and retaliatory acts." ECF No. 136-10 at 6 ¶ 19; see Farmer, 511 U.S. at 843 (noting the widely known problem that when a prisoner is labeled as a "snitch," the prisoner "will frequently [be] singled out for violent attack[s] by other inmates").

[8] Because summary judgment in favor of Defendants is warranted given the undisputed material facts and the law on deliberate indifference, the Court need not discuss

## V. Recommendation

For the reasons discussed, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, ECF No. 136, be **GRANTED** and judgment entered in Defendants' favor on all claims.

**IN CHAMBERS** at Tallahassee, Florida on July 23, 2026.

**s/ Martin A. Fitzpatrick**
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636(b)(1)(C).**

---

Defendants' other arguments of causation, qualified immunity, and compensatory damages.